# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | |
|---|---|
| United States of America, ) | CRIMINAL NO. 3:13-133-CMC |
| ) | |
| v. ) | **OPINION and ORDER** |
| ) | |
| Brett Davis Parker, Jack Winfred Parker, ) | |
| Douglas E. Taylor, Jr., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

This matter is before the court on Defendants' motion for new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, filed on September 24, 2013. Dkt. No. 142. The Government filed a response on October 8, 2013 (Dkt. No. 149), to which Defendants replied on October 14, 2013 (Dkt. No. 151). For reasons stated below, the court denies Defendants' motion for new trial.

## BACKGROUND

After a three-day trial, a jury convicted Defendants Brett Davis Parker ("Brett Parker"), Jack Winfred Parker ("Jack Parker"), and Douglas E. Taylor ("Doug Taylor") of operating an illegal gambling business in violation of 18 U.S.C. § 1955. In order to establish a violation of 18 U.S.C. § 1955, the government was required to prove (1) there was a gambling business, which was in violation of South Carolina law; (2) five or more persons knowingly and deliberately conducted, financed, managed, supervised, directed, or owned all or part of the gambling business; and (3) the gambling business was either in substantially continuous operation for more than 30 days or, alternatively, the gambling business, on at least one day, had a gross revenue of $2000 or more. Defendants stipulated that each of them was a bookmaker who conducted a sports gambling business and that bookmaking is a violation of South Carolina law, specifically S.C. Code § 16-19-130. Defendants stipulated that Brett Parker and Bryan Capnerhurst worked together in a sports gambling

1

business, and that Jack Parker and Doug Taylor worked together in a sports gambling business. Defendants also stipulated that Brett Parker's wife, Tammy Parker, knew about Brett Parker and Bryan Capnerhurst's sports gambling business. Defendants further stipulated that Tammy Parker and Bryan Capnerhurst were deceased at the time of trial but were alive during all relevant time periods covered by the Indictment.

The Government's theory was that Brett Parker, Bryan Capnerhurst, Jack Parker, and Doug Taylor were operating a single business for more than 30 days or on at least one day in which the business grossed more than $2000 during the period of the Indictment (between 2008 through February 13, 2013). The Government presented testimony that Jack Parker and Doug Taylor's phone lines were sometimes forwarded to Brett Parker and Bryan Capnerhurst, and that Jack or Doug would sometimes answer the phone lines of Brett and Bryan.  To prove a fifth person was part of the gambling business during the relevant time period, the Government presented evidence concerning alleged involvement by the following: (1) Tammy Parker, (2) a lay-off person or persons,[1] and (3)

---

[1] The Eighth Circuit has described lay-off betting as follows:

> To protect against losses, a bookmaker normally engages in "lay off" betting whereby he passes on to another bookmaker the amount of bets by which his own "book" is unbalanced; thus to the extent he loses to his own customers, he wins back from the other bookmaker, or vice versa. The "lay off" bet is therefore, in effect, bookmaker's insurance or reinsurance. Bookmakers, however, can . . . place personal wagers with one another which are not "lay off" bets.

*United States v. Thomas,* 508 F.2d 1200, 1202 n.2 (8th Cir. 1975). *See also United States v. George*, 568 F.2d 1064 (citing the definitions from *Thomas*). A bookmaker who places "lay off" bets with another bookmaker brings the second bookmaker into the gambling operation as someone who "conducts," "finances," "manages," "supervises," "directs," or "owns" all or part of the gambling operation. *See George*, 568 F.2d at 1071. A bookmaker who accepts a single layoff bet may be brought into the gambling operation. *See United States v. Jenkins*, 649 F.2d 273, 275 (4th Cir. 1981).

2

a person supplying line information to Brett Parker.[2]

**Tammy Parker.** As to Tammy Parker, the Government presented the testimony of Ben Staples, an accountant who was Tammy Parker's close friend and former paramour. Staples testified that he had seen the Parkers' upstairs home office, where Tammy and Brett had desks about eight feet apart, and that Tammy did not have an office outside of her home. Sept. 17 Tr. at 105. Staples testified he advised Tammy Parker to report gambling proceeds to the Internal Revenue Service as income on her joint tax return and that she began reporting gambling proceeds as income on her 2008 joint tax return. *Id.* at 101. Further, Staples testified that Tammy came to his office to prepare her tax returns every year using his computer software, and that he sat next to her and assisted her in using the software. *Id.* at 98-99. He testified that she last came to his office to prepare her joint tax return on March 29, 2012. *Id.* at 99. Staples identified Tammy Parker's handwriting on family

---

[2] Bookmakers often receive "line information" from other bookmakers. As described by the Eighth Circuit:

> The "line" constitutes the "odds" or "handicaps" or "point spreads" on the wagered contests. This is a list of the teams and events with a certain number of points attributed to the nonfavored team. To win a bet on the favored team, therefore, that team must win by a score exceeding the point spread given to the nonfavored team. The "line" is subject to change as a given event approaches and a bookmaker may alter the "line" on a particular event in order to try and even out the money wagered on each side.
>
> Bookmakers may cooperate with one another by keeping their "lines" consistent in order to avoid "middling," whereby a bettor, because there are two different point spreads on a single event, may bet and win on both competing teams.

*Thomas,* 508 F.2d 1200, 1202 n.2. The exchange of line information, alone, is not sufficient to bring the provider of line information into the gambling business as one of the five or more persons. *United States v. McKoy*, 539 F.2d 1050, 1061-62 (5th Cir. 1976). However, if a bookmaker regularly receives line information from another bookmaker and regularly uses that line information to set his own line, the second bookmaker may be found to be one of the five statutory persons in the gambling business. *George*, 568 F.2d at 1069.

3

budgets prepared by her, and this evidence was introduced over Defendants' hearsay objection. *Id.* at 105-08. The Government's position was that Tammy Parker was tracking the amount of gambling proceeds for her family budget, including the percentages to be allocated to "Brian" (presumably Bryan Capnerhurst). Tammy also used the terms "Booking" and "Booking Fund" throughout the budget notes, usually with $15,000 or $20,000 written beside it. *Id.* at 110-113. Staples was not permitted to interpret Tammy's notes, but only to publish certain portions. Staples testified, however, that Tammy had rejoined a band in 2010, but limited her participation to one gig per month, receiving about $175 per gig. *Id.* at 104. Staples further testified that Tammy referred to Brett's work as "booking." *Id.* at 100.

In addition to Staples' testimony, the Government presented testimony that police found an envelope on Tammy's desk in the home office with "Booking" written on it and that it had the amount of $20,000 "associated with it." Sept. 16 Tr. 17. Testimony also showed that Tammy sometimes prepared meals for the gambling partners while the gambling business was being conducted in her home. *Id.* at 12. One gambler, Hal Saxby, testified that he had seen Tammy Parker "a handful of times" since 2006, when he delivered payments to Brett Parker's house. *Id.* at 61. If Brett Parker was not at home, Tammy Parker would sometimes answer the door and Saxby would ask her to give Brett the envelope with the payment. *Id.* at 61-62. The envelope would have Brett's name on it and sometimes listed the amount of money in the envelope. *Id.* at 63.

**Lay Off Person(s).** Prior to Staples' testimony, the Government admitted, without objection, an audio recording of a conversation on May 16, 2012 between Staples and Brett Parker. The Government played the audio recording during Staples' testimony. Sept. 17 Tr. 114. In that recorded conversation, Staples asked Brett Parker about the concept of lay-off bets, and Brett described how

4

lay offs worked and that he had two or three people that he could use to lay off bets. Staples identified the voices on the recording, and then testified as follows:

> Q (Mr. Holliday) After the conversation that you had with Brett was it clear to you that he was laying off with other bookies?
>
> A [Staples]. Yes.
>
> Q. Including his father?
>
> A. Including Jack.
>
> Q. Did he give a number of other bookies that he was laying off with?
>
> A. He said two or three.
>
> Q. Then was there also an extensive conversation regarding how he would lay off for pro football games? Also how he would lay off for Clemson and Carolina football games?
>
> A. Yes.
>
> Q. But ultimately if the lines were off he had two to three people that he could lay off with, is that correct?
>
> A. Correct.

*Id.* at 117-18.

The Government also presented testimony, through Harry Benenhaley, that Brett Parker was laying off bets to Lanny Gunter and his partner, Benenhaley, and that Jack Parker called Benenhaley on one occasion to lay off a bet for Brett during basketball season.[3] *Id.* at 24-35. Benenhaley also testified that Ron Spence joined his and Gunter's business at one point and that the three of them stayed together until "the law made [them] quit." *Id.* at 19. Major Stan Smith testified that Brett

---

[3] Benenhaley could not identify which basketball season. *Id.* at 92.

5

Parker admitted to him that he had laid off bets to Ron Spence, but conceded that Spence did not confirm this. One bettor, Michael Gore, testified he had a conversation with Brett "about how bookies balance their books," specifically about laying off. *Id.* at 90. Gore clarified on cross examination that Brett said that if he got heavy on one side, he *could* lay off with someone else, not that he actually did lay off. *Id.* at 92.

**Line Information Provider.** Benenhaley testified that he consistently provided betting lines to Brett "[w]hen Brett first started." *Id.* at 34. Vincent Dudley Sanford, another sports bookie, testified that he regularly supplied Brett with his own lines on a daily basis from 2009 through 2012 for professional baseball and professional basketball. *Id.* at 60, 69-70. Sanford also testified that Brett regularly placed bets with Sanford on basketball and baseball games. *Id.* at 61. Sanford testified that Brett would need Sanford's lines if Brett wanted to bet on a game with him. *Id.* at 69. Phone records indicated that Brett received Sanford's lines after Brett had provided his lines to his customers via text message. *Id.* at 72-74. On cross examination, Sanford agreed that the phone records suggested that after Sanford sent Brett a line, Brett would bet with Sanford. *Id.* at 74. Sanford also agreed the records showed that Brett would bet with Sanford before Brett's customers bet with Brett. *Id.* Although the Government suggested on redirect that Brett could have used Sanford's lines to set his own lines for customers placing bets via phone, the Government provided no further evidence that Brett used Sanford's lines in his gambling business. *Id.* at 81.

**Deliberations and Verdict.** During jury deliberations, the jury asked a question: "During any 30 day period, do we 12 have to agree on there being 'a' 5th person or there being the same 5th person?" Dkt. No. 128 at 1. Relying on *United States v. Nicolaou*, 180 F.3d 565 (4th Cir. 1999), the court instructed the jury that they must agree that there was a fifth person, but they did not have

to agree on the same fifth person. The jury also sent a note requesting "the transcript of Benenhaley's testimony." *Id.* at 3. A follow-up jury note clarified that they wanted "the excerpt towards the end of the conversation where Benehaley [*sic*] discusses his phone conversation with Jack laying off for Brett." *Id.* at 4. On Wednesday, September 18, 2013, the jury found all three Defendants guilty of operating an illegal gambling business in violation of 18 U.S.C. § 1955.

**Motion for New Trial.** On September 24, 2013, Defendants filed a motion for new trial based on the filing of a civil complaint against Ben Staples by the United States Attorney's Office and the United States Securities and Exchange Commission ("SEC") on Friday, September 20, 2013. The complaint, filed in this court, alleges that Ben Staples was operating a scheme to defraud bond issuers from early 2008 through June 2012. *See United States Securities and Exchange Commission v. Staples*, D.S.C. Civil Action No. 3:13-2575-MBS. Staples allegedly located terminally ill persons concerned with paying funeral expenses. In return for payment of up to $10,000, Staples would open a joint brokerage account in their name and his name, have them sign over their ownership interest in the account to him, purchase bonds with a survivor's option in the joint account, and upon their death, redeem the bonds while representing to bond issuers that the deceased individuals had ownership rights in the bonds. According to the complaint, Staples made at least $6.5 million in profits from bond issuers as a result of this scheme, which resulted from the difference in the price of the discounted bonds when purchased and the full principal amount obtained when redeeming the bonds early.

Defendants argue they are entitled to a new trial because the Government suppressed evidence of the ongoing SEC investigation and forthcoming civil complaint against Staples in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Defendants contend that the prosecution knew

no later than Friday, September 13, 2013, that Staples was the target of an active SEC-Utah investigation. Defendants argue that the Government knew or should have known either prior to trial (which started on September 16, 2013), prior to Staples' testimony (September 17, 2012), or at least by the time of the jury verdict (September 18, 2013), that the Civil Division of the United States Attorney's Office was assisting the SEC in preparing to file a civil complaint alleging fraud against Staples. Defendants argue if this information had been disclosed, they would have used the fact of an active fraud investigation to impeach Staples. In essence, Defendants contend that the Government presented the testimony of Staples, while failing to disclose that it had determined he had committed a $6.5 million fraud. Further, Defendants contend that this evidence is material in that there is a reasonable probability that the result of the proceeding would have been different had they known of and impeached Staples with this information pursuant to Rule 608(b), Federal Rules of Evidence.

**Government's Opposition to Motion for New Trial.** The Government opposes Defendants' motion for new trial. First, the Government argues that disclosure of the SEC-Utah investigation was unnecessary because Defendants knew that Ben Staples was being investigated. Second, the Government argues that Defendants would not have been permitted to cross examine Ben Staples about the investigation. Third, the Government contends that even if Defendants had been allowed to cross examine Ben Staples as to the allegations of the civil complaint, there would have been no impact on the verdict because Ben Staples would have denied the allegations. The Government discounts the importance of Staples' testimony, calling him "an authenticating witness." Dkt. No. 149 at 11. Fourth, the Government argues that it had no obligation to disclose the imminent filing of the civil complaint "by the Utah office" of the SEC because the prosecutors were unaware

of it until after it was filed. Finally, the Government argues that the mere filing of a complaint is immaterial and inadmissible as cross-examination material under Rule 608(b) of the Federal Rules of Evidence.

**Defendants' Reply.** Defendants reply that (1) Defendants were unaware of an SEC investigation into Staples' activities; (2) the information about the SEC-Utah investigation could have been used to impeach Staples; (3) the information would have changed the outcome of the trial; (4) the Government was actually aware of the SEC-Utah investigation prior to trial; and (5) the Government's civil complaint against Staples indicates that the Government had a good faith belief that Staples committed fraud.

## STANDARD

"Upon the defendant's motion, a court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution" and justifies a new trial. 373 U.S. 83, 87 (1963). "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general [*Brady*] rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972).

## DISCUSSION

No later than Friday, September 13, 2013, Ben Staples told the prosecution team that SEC-Utah was actively investigating him. It is unclear what the prosecution team learned from Staples, what efforts were made to find out more information about the investigation, whether Staples was

9

represented by counsel during that meeting, and how Staples was advised to handle any potential questions about his business practices or the SEC-Utah investigation. The prosecution team did not tell Defendants about the active investigation prior to or during trial, which began on Monday, September 16 and ended late afternoon Wednesday, September 18, 2013. Ben Staples testified on Tuesday, September 17, 2013 and was not cross examined.

Other members of the United States Attorney's Office also learned of, and participated in the filing of, the civil complaint against Staples during the week of trial. On Thursday, September 12, 2013, SEC-Utah called AUSA Barbara Bowens, Chief of the Civil Division, to ask if her office would serve as local counsel for the SEC in a civil action to be filed shortly. The name of the defendant was not disclosed to Bowens during that call. At 3:20 p.m. on Tuesday, September 17, 2013, SEC-Utah emailed Bowens a copy of the draft complaint, which identified Benjamin Sydney Staples and Benjamin Oneal Staples as defendants.[4] Bowens reviewed the complaint and discussed the case with AUSA James Leventis. On Wednesday, September 18, 2013, Bowens again reviewed the complaint, edited it to comply with local court rules, and emailed the revised complaint to SEC-Utah. Later that afternoon, Bowens read an article in The State newspaper about Ben Staples' testimony in the ongoing trial. Bowens called SEC-Utah "to inquire if they knew if it was the same Ben Staples." Dkt. No. 149-7 at 3. It is not known what she was told. On Friday, September 20, 2013, Bowens filed the civil complaint. An SEC press release was issued that same date announcing the Staples complaint. Bowens first discussed the Staples complaint with the prosecution team on Monday, September 23, 2013.

---

[4] Benjamin Sydney Staples testified in this trial. Benjamin Oneal Staples is his son.

10

Prior to the SEC-Utah investigation, Ben Staples was the subject of at least two other related investigations. In 2008, the South Carolina Attorney General's ("SCAG") Office investigated Staples' conduct regarding bond purchases but concluded he had violated no state securities regulations. Prior to May 2010, the Federal Bureau of Investigation ("FBI") opened an investigation into Staples after a stock broker complained about Staples' bond buying practices. In May 2010, FBI Special Agent Ron Grosse discussed the investigation with attorneys from the SEC in Atlanta and an AUSA in South Carolina, but the Government attorneys failed to identify a regulatory or criminal violation. As a result, Grosse drafted a closing memorandum on August 20, 2010, recommending that the case be closed. It is unclear when the prosecution team learned about the 2008 SCAG and 2010 FBI investigations. It is also not known how the investigation made its way to SEC-Utah.

**What did the Government Know?** The Government admits that it had evidence that was not disclosed to Defendants prior to trial – information that Staples was being investigated by SEC-Utah. The Government contends, however, that it did not know of the imminent civil complaint and had no duty to learn of investigations by other governmental agencies. Dkt. No. 149 at 4 (citing *United States v. Smith*, 398 Fed. Appx. 938, 941 (4th Cir. 2010) ("There is no requirement that prosecutors in one district be aware of and disclose information in the possession of other governmental offices."); *United States v. Pelullo*, 399 F.3d 197, 217 (3d Cir. 2005); *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996)). The cases cited by the Government, however, are not applicable when the prosecutors learn from the witness that he is under active investigation. For purposes of analyzing whether a *Brady* violation occurred, the court assumes both the evidence of the active SEC investigation and imminent civil complaint were known by the Government and undisclosed.

11

**Was There a *Brady* Violation?** The mere fact that evidence was undisclosed, however, does not amount to a constitutional violation under *Brady*.[5] To establish a *Brady* violation, Defendants must show that undisclosed evidence was "(1) favorable to [them] either because it is exculpatory, or because it is impeaching; (2) material to the defense, *i.e.*, 'prejudice must have ensued'; and (3) that the prosecution had materials and failed to disclose them." *United States v. Wilson*, 624 F.3d 640, 660-61 (4th Cir. 2010). The court considers these elements below, albeit in a different order.

**(1) Impeaching Evidence.** Defendants argue that the undisclosed evidence of the SEC-Utah investigation and the forthcoming civil complaint would have been admissible to impeach Staples as prior bad acts evidence pursuant to Rule 608(b). Rule 608(b) allows "inquiry only into instances of misconduct that are 'clearly probative of truthfulness or untruthfulness,' such as perjury, fraud, swindling, forgery, bribery, and embezzlement." *United States v. Leake*, 642 F.2d 715, 718 (4th Cir. 1981) (internal quotations omitted). Factors to be considered in determining whether to allow inquiry into Rule 608(b) include "the importance of the testimony to the government's case, the relevance of the conduct to the witness's truthfulness, and the danger of prejudice, confusion, or delay raised by evidence sought to be adduced." *Id.* at 719.

The Government argues that SEC-Utah's civil complaint against Staples alleging fraud is not a proper subject for cross examination. The Government contends that "[t]he illegality or impropriety of Staples' business activity is a highly contested issue, particularly given the

---

[5] While intentional failure to disclose evidence is not necessarily unconstitutional, it may violate ethical rules of conduct or the Federal Rules of Criminal Procedure. *See Kyles v. Whitley*, 514 U.S. 419 (1995) (explaining that the ABA Standards for Criminal Justice 3-3.11 and the ABA Model Rule of Professional Conduct 3.8(d) require disclosure of exculpatory or mitigating evidence); Fed. R. Crim. P. 16. For purposes of analyzing a *Brady* violation, the court need not determine whether a duty to disclose was triggered by any ethical or procedural rule or whether the failure to disclose evidence was intentional or unintentional.

declination by federal and state law enforcement agencies in South Carolina." Dkt. No. 149 at 9. The Government also contends "'[t]he mere filing of a complaint is not probative of truthfulness or untruthfulness, [as required to be inquired into under Rule 608 (b)] regardless of whether the allegations in the complaint, if true, would seriously undermine the witness' credibility.'" *Id.* at 18 (quoting *United States v. Morrison*, 98 F.3d 619, 628 (D.C. Cir. 1996)). The Government finally contends that an investigation is even less probative of truthfulness or untruthfulness than the filing of a complaint, and is not a proper subject of cross examination.

The Government argues that *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), prevents inquiry into a civil complaint on cross examination. *Morrison* is distinguishable because it involved a private civil complaint. In this case, the Government offered the testimony of a witness, Staples, whom it had investigated for securities fraud. In addition, prior to trial, SEC-Utah had determined that Staples committed fraud and decided to file a civil complaint against him. Contrary to the Government's position that a complaint merely represents "a theory of wrongdoing," Rule 11 of the Federal Rules of Civil Procedure provides that an attorney's signature on a complaint certifies that "factual allegations have evidentiary support." The Government's civil complaint shows that it believes Staples has knowingly committed fraud.

The court finds that Defendants would have been able to inquire at least about the fact that Staples was aware he was under an active SEC-Utah investigation into his bond buying practices. Because the Government relied on Staples, in part, to place Tammy and Brett in the gambling business and to authenticate two pieces of evidence, the court would have allowed limited inquiry into the fraud investigation as it would have been relevant to Staples' character for truthfulness.

13

There would have been little danger of prejudice, confusion, or delay caused by a limited inquiry into Staples' awareness of the ongoing SEC investigation, which he had admitted to prosecutors.[6]

Further, even if not admissible under Rule 608(b), the court would have allowed Defendant to inquire about Staples' motivation, if any, for testifying for the Government – the same Government finalizing a complaint against him. The court, therefore, concludes that evidence of Staples' awareness of an active SEC-Utah investigation of him for fraudulent bond practices would have been proper impeachment evidence. The court also assumes for purposes of this motion that it would have allowed limited inquiry into Staples' awareness, if any, of the SEC's decision to file a civil complaint against him.

**2. Suppressed Evidence.** As explained above, the court assumes for purposes of this motion that the Government knew of the active SEC investigation and imminent civil complaint and did not disclose this evidence to Defendants prior to or during trial. Although the Government admits Staples informed the prosecutors prior to trial that he was being investigated by SEC-Utah, the Government contends it did not convey this information to Defendants because Defendants already knew it. *See United States v. Jeffers*, 570 F.3d 557, 573 (4th Cir. 2009) ("[T]here is no *Brady* violation if the defense is aware of the evidence in time to reasonably and effectively use it at trial."). Citing to a recorded jail call dated March 28, 2013, the Government highlights that Brett and Jack Parker discussed Staples' practice of "get[ting] money from people, from old people through the

---

[6] The Government argues that Staples would have denied the fraud allegations, and Defendants would not have been able to admit the civil complaint because Rule 608(b) prohibits extrinsic evidence in this situation. However, the court finds that counsel for Defendants could have crafted effective questions for the purpose of impeachment, which would not have depended on Staples' cooperation nor on the introduction of extrinsic evidence. Having admitted to prosecutors that he was under active investigation by SEC-Utah, Staples hardly could have denied this fact if questioned about it.

government." Dkt. No. 149 at 6. Brett Parker also commented that Staples was "scamming old people out of money" and "if they investigate his a** he won't want to get on the stand." *Id.* Next, the Government cites to Special Agent Patrick Pruitt's affidavit, in which Pruitt avers that Jack Parker approached him on the morning of jury selection while waiting in the security line to enter the courthouse. Pruitt states that Jack Parker asked him if he "was aware of some of the questionable business practices Ben Staples had been involved in and did [he] know that [Staples] was being investigated for those activities." Dkt. No. 149-1 at 2. Pruitt avers that Jack Parker said that information had been provide by his investigator "Jay." *Id.*

Defendants deny the account in Pruitt's affidavit and submitted an affidavit from Jack Parker's investigator, John Phillips. Phillips avers that he first learned of a possible prior investigation of Staples the day after jury selection, when counsel for Defendants met with Lanny Gunter. Dkt. No. 151-2 at 1. Phillips avers that he then asked Brett Parker's attorney, Kathy Evatt, to have her investigator research records for any investigations of Staples. *Id.* Phillips states that Evatt's investigator was unable to locate any documentation of an investigation of Staples. *Id.* at 2.

On October 24, 2013, the Government submitted an additional jail call between Brett and Jack Parker dated March 29, 2013, the day after the jail call cited in its opposition brief. Dkt. No. 152, 153. This call does not provide additional information as to Brett or Jack's knowledge of an SEC investigation into Staples. It does, however, show that Brett and Jack Parker believed Staples was stealing payments from the Internal Revenue Service or Social Security, which were owed to elderly or sick people, perhaps upon their death.

Nothing cited by the Government shows that Brett and Jack Parker knew of an active SEC investigation. On its face, the evidence submitted by the Government suggests that Brett and Jack

15

Parker may have thought Staples had stolen from elderly or sick people, not from bond issuers as alleged in the civil complaint. This is consistent with what Jack Parker admits to knowing. Further, the Government has submitted nothing to suggest that Doug Taylor knew of the SEC investigation, or even suspected that Staples' business practices were illegal or fraudulent. In light of the fact that the Government cannot show it informed Defendants of the SEC investigation, and the fact that the evidence submitted by the Government does not establish Defendants knew of the active SEC investigation, the court finds that Defendants were unaware of the active SEC investigation. Further, the Government does not argue, and the court does not find, that Defendants had knowledge of the imminent civil complaint. However, despite Defendants' lack of knowledge, Defendants cannot show a *Brady* violation because they have failed to establish materiality.

**3. Materiality.** Defendants must show that the undisclosed evidence was material to establish a *Brady* violation. *Brady*, 373 U.S. at 87. "'[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Smith v. Cain*, __ U.S. __, 132 S.Ct. 627, 630 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469-70 (2009)). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). "[T]he materiality element of a *Brady* claim requires a collective assessment of whether introduction of the exculpatory evidence might have affected the outcome of the trial." *Winston v. Kelly*, 592 F.3d 535, 556 (4th Cir. 2010).

16

As discussed earlier, Staples authenticated Tammy Parker's budget notes in which she included amounts arguably associated with the gambling business. Staples also provided limited testimony about a recorded conversation between Brett Parker and Staples in which Brett explained lay-off betting. Staples testified that he advised Tammy Parker to report proceeds from the gambling business on her and Brett's joint tax return. He also testified that she came to his office and prepared the joint return using his tax software. Based on that testimony, and in light of other testimony that Tammy shared an office with Brett and sometimes accepted payment for a gambling account, a juror could have found that Tammy served as a bookkeeper of sorts for the gambling business, and thus the requisite fifth participant.

On the other hand, the Government's case did not depend on Tammy Parker being the fifth participant. The Government also presented evidence of other possible participants – a lay-off person or persons and a person supplying line information to Brett. Benenhaley testified that Brett Parker was regularly laying off bets to his gambling business with Lanny Gunter and Ron Spence, and that Jack Parker called Benenhaley to lay off a bet for Brett on one occasion during basketball season. Major Stan Smith also testified that Brett Parker admitted to him that he had laid off bets. Brett admitted in his conversation with Staples that he had two or three people to whom he could lay off. Further, Sanford testified that he regularly supplied line information to Brett between 2009 and 2012. The jury's verdict could have rested on Benenhaley's testimony or Brett's own statements about laying off bets, or on Sanford's testimony about regularly supplying line information. *See United States v. McLean*, 715 F.3d 129 (4th Cir. 2013) ("[E]ven assuming the settlement had some impeachment value, the jury's verdict could have rested on the testimony from Dr. Gilchrist and the

17

many other former employees and patients who testified at trial. We cannot say there is a reasonable probability that disclosure of the settlement would have altered the jury's verdict.").

Most importantly, Staples' testimony was limited to authenticating and publishing certain portions of Tammy's notes, authenticating the voices on the recording, and confirming a few statements that he heard Brett say on the recording. Although Defendants objected to the admissibility of Tammy's budget notes on hearsay grounds, Defendants did not challenge the authenticity of the notes or the recorded conversation. Nor did Defendants challenge Staples' statement that Tammy prepared the joint tax return at his office, in which she included gambling proceeds. Based on Staples' limited testimony, and the fact that he testified to largely undisputed facts, the court finds that further undermining Staples' credibility as a witness would not have likely impacted this case.[7] As a result, the court cannot say there is a reasonable probability that disclosure of the active SEC-Utah investigation of Staples and imminent civil complaint would have altered the result of this proceeding. In other words, the court does not find that with this evidence, the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. Defendants, therefore, have not established that the undisclosed evidence was material and, thus, cannot show a *Brady* violation.

---

[7] On direct examination, the prosecution questioned Staples about his extra-marital affair with Tammy Parker. Staples admitted the affair. The jury could have discounted or rejected Staples' testimony based on Staples' potential bias against Brett Parker. The court cannot say with a reasonable probability that inquiry into the SEC-Utah investigation would have further impeached Staples and altered the jury's verdict. *See United States v. Bartko*, __ F.3d __, 2013 WL 4560333, *9 (4th Cir. Aug. 23, 2013) (quoting *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998) ("[W]e may find impeaching evidence to be 'material where the witness supplied the only evidence of an essential element of the offense.' 'This is especially true where the undisclosed matter would have provided the only significant basis for impeachment.'").

18

## CONCLUSION

For reasons stated above, Defendants' motion for new trial is denied.

**IT IS SO ORDERED.**

                                                S/ Cameron McGowan Currie
                                                CAMERON MCGOWAN CURRIE
                                                Senior United States District Judge

Columbia, South Carolina
November 4, 2013